**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3487 & 09-3699
_____

UNITED STATES OF AMERICA,
Appellant in 09-3699

v.

SHAWN TYSON,
Appellant in 09-3487
_____

On Appeal from the District Court
of the United States Virgin Islands
District Court  No. 3-08-cr-00049-001
District Judge: The Honorable Curtis V. Gómez

Argued December 14, 2010

Before: McKEE, *Chief Judge*, FUENTES and SMITH,
*Circuit Judges*

(Filed: August 3, 2011 )

Kim L. Chisholm, Esq.
Ishmael A. Meyers, Jr., Esq.
St. Clair Theodore, Esq.
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
Charlotte Amalie, St. Thomas, VI  00802

John M. Pellettieri, Esq. (argued)
United States Department of Justice
Appellate Section
Room 1264
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
        *Counsel for Appellee*

Leonard B. Francis, Jr., Esq. (argued)
4A Dronningens
P.O. Box 8838
Charlotte Amalie, St. Thomas, VI  000801
        *Counsel for Appellant*

_____

OPINION
_____

SMITH, *Circuit Judge.*


A jury in the District of the Virgin Islands convicted defendant Shawn Tyson of numerous federal firearms offenses, including twelve counts of transporting a firearm in

2

the course of dealing firearms without a license, one count of transporting a firearm with knowledge or reasonable cause to believe that it would be used to commit a crime, one count of transferring a firearm to an out-of-state resident, and one count of conspiring to unlawfully transport firearms. The jury also found Tyson guilty of ten counts of unauthorized possession of a firearm under Virgin Islands law. Following pronouncement of the verdict, the District Court granted Tyson a judgment of acquittal on each of the federal counts. Such relief was denied with respect to the convictions charging violations of the Virgin Islands Code.

We are presented with cross appeals from the final judgment entered by the District Court. Tyson challenges the sufficiency of the evidence introduced in support of the counts arising under local law, while the government contends that we should reinstate the jury's verdict on the federal firearms counts. For the reasons set forth below, we conclude that Tyson's appeal is without merit. We also conclude that the District Court was correct to enter judgment of acquittal on the conspiracy count sounding in federal law. With respect to the remaining federal counts, however, we agree with the government's contention that the District Court erred by granting Tyson Rule 29 relief. Accordingly, we will reverse the judgment in part and remand the matter with instructions to reinstate the jury verdict on each of the federal counts save that charging Tyson with conspiracy to transport firearms in violation of federal law.

I

It is not difficult to acquire a firearm legally in the state of Tennessee. A firearms license is not required to buy most guns. Rather, an interested purchaser need only pass an

3

instant background check,[1] required by state law, and complete a Form 4473, required by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).[2] Virgin Islands law is more stringent. An interested buyer must obtain a firearms license from the Virgin Islands Police Commissioner. 23 V.I.C. § 455. Only a Virgin Islands resident may obtain such a license, 23 V.I.C. § 456(a)(2), and the Commissioner is empowered to deny a license request for, *inter alia*, prior felony conviction, mental incompetence, habitual drunkenness, or for being an "improper person" (whatever that means), 23 V.I.C. § 458(a). Each firearm purchased in or imported into the Virgin Islands must be registered with the police. 23 V.I.C. § 470.

Tyson apparently looked at the Islands' regulated gun market and saw an arbitrage opportunity. To capitalize on this, he began purchasing a significant quantity of firearms in his home state of Tennessee, where procurement was easy, and then transporting those weapons to the Virgin Islands for resale. The scheme began in earnest in late 2007. On December 1, Tyson bought two semiautomatic rifles from a pawn shop near his home in Bristol, Tennessee. He purchased a semiautomatic pistol from a gun store in neighboring Jonesboro the following day.[3] On December 11,

---

[1] The instant background check ensures the potential purchaser is not a convicted felon and is not the subject of an active restraining order.

[2] Form 4473 records a purchaser's identification information and the firearm's make, model, and serial number. The purchaser must also sign a short affidavit stating that he or she is eligible under federal law to purchase firearms.

[3] Tyson acquired these weapons legally; prior to each transaction, he passed the instant background check required by the state of

4

2007, Tyson flew from Tennessee to St. Thomas—his first of four trips over the course of the next seven months. He returned to Tennessee on January 10, 2008. Within three weeks, Tyson had purchased eight more semiautomatic weapons. Two of these were rifles; six were handguns.

Tyson made a second trip to the Virgin Islands on February 6. Delta Airlines ticketing agent Dudley Breeding assisted Tyson with his luggage and recalled that Tyson checked a large, black rectangular suitcase that contained firearms.[4] Tyson told Breeding he was an antique gun collector and intended to sell the weapons when he reached St. Thomas. However, Tyson was not licensed to sell or possess firearms in the Virgin Islands.[5] Nor was he licensed under federal law to sell or transport firearms for sale in interstate commerce.[6] Tyson also failed to register the weapons with the Virgin Islands police when he arrived in St. Thomas.

Tennessee and completed Form 4473. Indeed, Tyson complied with these requirements each time he purchased a firearm in Tennessee.

[4] Federal regulations allow airline passengers to transport firearms provided they are checked for in-flight storage and packed in a locked, hard-side container. 49 C.F.R. § 1544.203(f). In addition, a passenger must complete a declaration form at the ticketing counter stating that each firearm contained in his or her baggage is unloaded. *See id.* § 1544.203(f)(2)(i). Tyson complied with these requirements each time he flew to the Virgin Islands.

[5] With certain exceptions not applicable here, *see* 23 V.I.C. § 453, Virgin Islands law makes it unlawful to possess a firearm without a license, 23 V.I.C. § 454; 14 V.I.C. § 2253(a).

[6] Federal law states that only a licensed importer, manufacturer, or dealer may import, manufacture, or deal firearms in interstate commerce. *See* 18 U.S.C. § 922.

5

Tyson returned from the Virgin Islands on February 13, accompanied by an individual named Kelroy Morrell. The following day, Tyson purchased seven semiautomatic firearms from local merchants in and around Bristol, Tennessee. Later that evening, local law enforcement received reports that someone was firing a gun from the front porch of Tyson's residence. When Bristol police officers arrived, they confronted the owner of the home, Sherry Wagner. She feigned ignorance but allowed the officers to enter the home so they could speak with Tyson.

Officers encountered Tyson and Morrell when they entered the residence. A 9mm pistol sat in plain view atop a nearby coffee table. Wagner and Tyson stated that they were unsure if there were more guns in the house. Officers found several when they entered Tyson's bedroom: two rifles were propped against the wall; several smaller firearms were hidden underneath Tyson's mattress; empty boxes, which once packaged firearms, littered the bedroom floor. A consensual search of the premises also produced receipts for multiple firearms purchases, ammunition, magazines for ammunition, and business cards belonging to sundry local gun merchants. Ultimately, however, this incident led to no arrests, for the guns had been purchased legally and none of the items discovered in Tyson's home are considered contraband under state or federal law.

Tyson continued to acquire guns. He bought one semiautomatic rifle and two semiautomatic pistols from Tull's Store in Selmer, Tennessee on February 16. He purchased an additional semiautomatic pistol from the same dealer the next day. On February 18, Tyson bought two more pistols from a merchant in Kingsport. He acquired another semiautomatic handgun on February 19. In sum, Tyson

purchased fourteen semiautomatic firearms between February 13, when he returned from the Virgin Islands with Morrell, and February 19.

On February 20, Tyson and Morrell arrived at the Tri-Cities Regional Airport. Each was toting a hard plastic suitcase full of guns. Their destination was St. Thomas. Delta ticketing agent Breeding assisted both men with their luggage. During the course of casual conversation, Tyson again told Breeding that he had a buyer for the weapons in the Virgin Islands. None of the weapons were registered with the Virgin Islands police when Tyson arrived at his destination.

On February 23, Tyson returned to Bristol without Morrell. He entered active duty service with the Tennessee Army National Guard three days later. There Tyson would remain until July 3, 2008, when he graduated as a private second class and was discharged home.

Tyson was but a few days removed from National Guard training before he was again buying firearms in sizeable quantities. He bought one pistol on July 12, five more on July 24, and two on July 28. On July 31, he set off on his fourth trip to the Virgin Islands. This time, federal law enforcement officers were waiting for him. Customs and Border Patrol notified ATF agent Jamie Jenkins that Tyson had checked in for a flight and was carrying eleven firearms in a hard plastic suitcase. He also had a significant quantity of ammunition in a separate black duffel bag. Agent Jenkins then contacted Penny Stricklin, an ATF agent stationed in the Virgin Islands. He told Stricklin that Tyson was destined for St. Thomas, firearms in tow. Apparently, Tyson's island visits had not gone unnoticed.

Stricklin determined that Tyson had neither a license to possess or distribute firearms in the Virgin Islands nor a federal license to import or deal firearms in the territories of the United States. She therefore obtained a warrant to search Tyson's luggage. She also arranged for federal and local law enforcement to intercept Tyson when he exited the airport.

Morrell and a second individual, Curtiss Thomas, were waiting outside the airport in Morrell's parked car when Tyson landed. Morrell stayed in the vehicle for several minutes before exiting the car and entering the airport. Deputy United States Marshal Brian Biermann, who was watching from a nearby vantage point, recalled that Tyson eventually exited the airport and, along with Morrell, "they had a red cap help[] with some baggage into the trunk of the vehicle." Tyson then closed the trunk and entered the vehicle's back seat.

Once Tyson was inside the car, Morrell began to drive toward the airport exit. He did not get far before Virgin Islands police and federal agents stopped the vehicle. Stricklin opened Morrell's trunk and seized the hard plastic suitcase and black duffel bag that Tyson had checked in Tennessee. This baggage contained a total of eleven firearms, 500 rounds of ammunition, and several ammunition magazines. Tyson, Morrell, and Thomas were arrested and Virgin Islands police impounded Morrell's car. Morrell later consented to a vehicle search, whereupon agents discovered an additional handgun hidden beneath the passenger seat.[7]

---

[7] The handgun belonged to Thomas. He was tried separately on charges of unlawfully transporting a firearm in interstate commerce in violation of 18 U.S.C. § 922(n), and unauthorized

Meanwhile, Tyson told Stricklin that he was visiting St. Thomas in order to see his mother. When Stricklin asked him about the guns, Tyson stated that he intended to register them with the local police. Stricklin told Tyson she thought he was lying. At this point, Tyson decided to say no more.

## II

On October 2, 2008, a grand jury indicted Tyson and Morrell on one count of conspiracy to unlawfully transport firearms in violation of 18 U.S.C. § 371 (Count One); twelve counts of transporting a firearm in the course of dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) (Counts Two through Thirteen); eleven counts of unauthorized possession of a firearm, in violation of 14 V.I.C. § 2253(a) (Counts Fourteen through Twenty-Four); one count of transporting a firearm with knowledge or reasonable cause to believe it would be used to commit a crime, in violation of 18 U.S.C. § 924(b) (Count Twenty-Five); and one count of transferring a firearm to an out-of-state resident, in violation of 18 U.S.C. § 922(a)(5) (Count Twenty-Six). Tyson and Morrell were tried jointly on all charges.[8] The District Court had jurisdiction pursuant to 18

---

possession of a firearm under 14 V.I.C. § 2253(a). Thomas was acquitted by a jury of both charges.

[8] Tyson filed a pretrial motion to suppress "all evidence gathered in this case, starting from the initial contact on February 14, 2008, in Tennessee." The District Court denied the motion after an evidentiary hearing. In his opening brief, Tyson identifies the Court's suppression order as one of three issues he is contesting on appeal. Tyson does not, however, single out any error in the District Court's ruling, nor does he substantively address the search(es) whose constitutionality he now assails. Tyson has therefore waived the issue for purposes of appeal. *See Kach v.*

U.S.C. § 3231 and 48 U.S.C. § 1612.

During its case-in-chief, the government presented evidence that Tyson purchased a total of thirty-five firearms between December 1, 2007 and July 28, 2008. Only twelve of those weapons were recovered. Eleven were seized during the July 31 traffic stop in St. Thomas. The twelfth was recovered on June 30, 2008 when Virgin Islands police apprehended an individual named Jelani LaTorre. LaTorre was carrying narcotics and a Hi-Point 9mm handgun whose serial number had been obliterated. Forensics experts traced the firearm and determined that Tyson had purchased the weapon in Tennessee for $139 on February 16, 2008, four days before making his third trip to St. Thomas. Two weeks prior to this acquisition, LaTorre wired Tyson $330 from St. Thomas.

The evidence of firearm trafficking did not end there. Bristol police searched Tyson's residence one week after his arrest. Among other items, they recovered a document that appeared to depict a kind of code. At the top of the document, the following notations were written: "CARSHOW = GUNSHOW"; "RIMS = GUNS"; "TIRES = AMMO." Eleven "RIMS" were then listed on the page. Beside each "RIM," a number was written. According to ATF agent Jenkins, these numbers corresponded to the caliber of a firearm model or a type of ammunition. Thus, for example, beside "RIM #1909" the notation "9MM" was written. The number ".40" appeared adjacent to "RIM

_Hose_, 589 F.3d 626, 642 (3d Cir. 2009) (stating that "a passing reference to an issue will not suffice to bring that issue before th[e] court" (citation and internal quotation marks omitted)); _United States v. Demichael_, 461 F.3d 414, 417 (3d Cir. 2006).

#1540." Other entries were even less veiled. "12ga – SHOTGUN" was written next to "RIM #1112." Another entry read, "RIM #1762 = 7.62X39 – AK47/SKS."

Officers also recovered a notepad containing a handwritten list of firearms. A number was written next to each firearm. To illustrate: the number "664.41" was written beside "Glock 40." Agent Jenkins testified that these numbers appeared to represent each firearm's cash value. On another page of the notepad, someone had written the letters "AK" and "AR."[9] Next to each notation were two columns labeled "Spent" and "Profit." With respect to AK: the number "500" was written below "Spent," while "2000" was written below "Profit." With respect to AR: the number "600" appeared under "Spent" and "1900" under "Profit."

At the close of the government's evidence, Tyson filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). The District Court reserved ruling on the motion and proceeded with trial.[10] Tyson presented no evidence in his defense; Morrell testified on his own behalf. The jury acquitted Morrell on all charges. Tyson, however, was convicted on all counts except one

---

[9] Agent Jenkins explained that the AK-47 and the AR-15 assault rifle are well-known firearms whose names begin with the letters appearing on the notepad.

[10] Under Federal Rule of Criminal Procedure 29(b), the district court "may reserve decision on the motion, proceed with trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." Fed. R. Crim. P. 29(b).

count of unauthorized possession of a firearm under local law.[11]

Tyson renewed his motion for judgment of acquittal after the jury returned its verdict. In a written order dated August 12, 2009, the District Court granted Tyson's motion as it pertained to each of the federal firearms counts (Counts One through Thirteen and Twenty-Five through Twenty-Six). The Court denied the motion with respect to the counts charging unauthorized possession of a firearm under Virgin Islands law (Counts Fourteen through Twenty-Three).

The parties filed timely cross appeals. We have jurisdiction under 28 U.S.C. § 1291.

### III

On a motion filed pursuant to Federal Rule of Criminal Procedure 29(a), the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The evidence is insufficient to sustain a conviction if a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). We review the district court's disposition of a Rule 29 motion *de novo*, applying the same standard the district court was required to apply. *United States v. Pendleton*, 636 F.3d 78, 83 (3d Cir. 2011). We will "sustain the verdict if there is

---

[11] Tyson was acquitted of Count Twenty-Four of the indictment. According to special agent Jay Quabius of the ATF, the firearm named in this count, which was one of the eleven seized on July 31, 2008, was inoperable. A conviction for unauthorized possession of a firearm under 14 V.I.C. § 2253(a) requires that the firearm at issue be operable. *See* 14 V.I.C. § 451(d).

substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)). Under this deferential standard of review, an appellate court "'must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the court's] judgment for that of the jury.'" *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (quoting *Brodie*, 403 F.3d at 133). A finding of insufficiency should be reserved for those situations in which "the prosecution's failure is clear." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010).

Tyson moved for Rule 29 relief at the conclusion of the government's case-in-chief. The District Court reserved decision on the motion and Tyson presented no evidence in his defense. Under Rule 29(b), "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). Accordingly, our review of the evidence is limited to that which was presented during the government's case-in-chief, "including evidence elicited on cross-examination of the government witnesses." *Brodie*, 403 F.3d at 134; *see also United States v. Moore*, 504 F.3d 1345, 1347 (11th Cir. 2007) (explaining that Rule 29 entitles the defendant "to a snapshot of the evidence at the point that the court reserves its ruling").

Having set forth the appropriate standard of review, we now proceed to the specific counts of conviction. We begin with the counts charging violation of federal law before proceeding to the counts arising under the Virgin Islands Code.

*A      Transporting a Firearm in the Course of Dealing Firearms Without a License*

Tyson was charged and convicted on twelve counts of transporting a firearm in the course of dealing firearms without a license—a violation of 18 U.S.C. § 922(a)(1)(A).[12] Section 922(a)(1)(A) states that it is unlawful for any person

> except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]

To obtain a conviction under this provision, the government must show that the defendant (1) engaged in the business of dealing in firearms; (2) was not a federally licensed firearms dealer; and (3) acted willfully. *United States v. Palmieri*, 21 F.3d 1265, 1268–70 & n.4 (3d Cir.), *vacated on other grounds*, 513 U.S. 957 (1994); *see also United States v. Sanchez-Corcino*, 85 F.3d 549, 554 (11th Cir. 1996); 18 U.S.C. § 924(a)(1)(D) (providing *mens rea* requirement).

The District Court held that there was sufficient evidence to prove Tyson was not a federally licensed firearms dealer, but insufficient evidence to demonstrate that he was "engaged in the business of dealing in firearms."[13]  But what

---

[12] The firearms identified in these twelve counts correspond to the eleven firearms seized on July 31, 2008, as well as the firearm seized from Jelani LaTorre on June 30, 2008.

[13] The District Court did not address the *mens rea* requirement because it found the government's failure to prove the first element of the crime to be dispositive.

14

does it mean to be "engaged in the business of dealing in firearms"?  According to the statute, a person is so engaged when he or she "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  18 U.S.C. § 921(a)(21)(C).  To conduct business "'with the principal objective of livelihood and profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  18 U.S.C. § 921(a)(22).  In this vein, the statute explicitly exempts those who "make[] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sell[] all or part of [their] personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).

By the statute's terms, then, a defendant engages in the business of dealing in firearms when his principal motivation is economic (i.e., "obtaining livelihood" and "profit") and he pursues this objective through the repetitive purchase and resale of firearms.  *Palmieri*, 21 F.3d at 1268 (stating that "economic interests" are the "principal purpose," and "repetitiveness" is "the *modus operandi*").  Although the quantity and frequency of sales are obviously a central concern, so also are (1) the location of the sales, (2) the conditions under which the sales occurred, (3) the defendant's behavior before, during, and after the sales, (4) the price charged for the weapons and the characteristics of the firearms sold, and (5) the intent of the seller at the time of the sales.  *Id.* (explaining that "the finder of fact must examine the intent of the actor and all circumstances surrounding the

15

acts alleged to constitute engaging in business"). As is often the case in such analyses, the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern presented.

Here, the government presented substantial indirect evidence of repetitive sales. Over the course of approximately seven months, Tyson flew to the Virgin Islands four times. Directly before each of these trips, he purchased several firearms in Tennessee. Tyson carried some number of these weapons on at least three of his flights and he never registered a single gun with the local police when he landed in St. Thomas. In total, Tyson purchased thirty-five firearms during the relevant time period. Only twelve were ever recovered; eleven guns were seized on July 31 and one weapon—with its serial number obliterated—was confiscated from Jelani LaTorre. A reasonable jury could conclude from this evidence that Tyson sold the twenty-three unrecovered (and unregistered) firearms during his first three trips to the Virgin Islands. A jury could further infer that Tyson had similar intentions for the eleven guns with which he was apprehended on the day of his arrest.

There was also evidence that Tyson's repetitive sales were driven by a pecuniary motive. In January 2008, LaTorre wired $330 to Tyson in Tennessee. Several weeks later, Tyson purchased a Hi-Point 9mm handgun for $139. The jury was free to infer from this evidence that Tyson had not only sold LaTorre the weapon, but that he did so for a sizeable markup. Such profit-seeking behavior falls squarely within the statutory definition of firearms dealing. *See* 18 U.S.C. § 921(a)(22). In addition, the government introduced a notepad seized from Tyson's residence in Tennessee. One page of the pad contained the notations "AK" and "AR,"

16

along with two columns labeled "Spent" and "Profit." Agent Jenkins testified that the AK-47 and AR-15 assault rifle were two of the more common semiautomatic firearms available for sale in Tennessee. Tyson bought several of each. On the notepad, the number "2000" appeared below the "Profit" column next to "AK"; the number "1900" was written in the "Profit" column corresponding to "AR." The jury could well have reasoned that the word "Profit" meant exactly what it said and that the numbers appearing in this column reflected a positive monetary yield. What is more, the overall timing and condition of the sales strongly suggests a pecuniary motive. Before each trip to St. Thomas, Tyson embarked on a purchasing spree, only to resell his newly-acquired arsenal when he arrived in the Virgin Islands. This buy-fly-resell pattern of behavior seems susceptible of no other explanation than one of economic gain.

The government's evidence is bolstered by the fact that Tyson himself admitted that he was traveling to the Virgin Islands in order to buy and sell firearms. Delta ticketing agent Breeding testified that she assisted Tyson with his baggage prior to several of his flights. Each time, Tyson told Breeding that he intended to sell the firearms packed in his luggage once he arrived in the Virgin Islands. In one instance, Tyson said "that he was an antique gun buyer and collector, and that he had a purchaser for all of the guns when he got back to the islands." The District Court discounted these assertions as "mere puffery." Such a finding was unwarranted in light of the record as a whole. Indeed, there was ample evidence that Tyson was transporting large numbers of firearms to the Virgin Islands in order to turn a profit from their resale. Thus, when Tyson told Breeding that this was exactly what he was up to, the jury had every right to

conclude that he was telling the truth. By minimizing Tyson's assertions, the District Court overrode the jury's credibility determination and substituted its own. This was error. *See United States v. McBane*, 433 F.3d 344, 348 (3d Cir. 2005) (stating that "[w]e do not weigh evidence or determine the credibility of witnesses" on sufficiency of the evidence review (citation and internal quotation marks omitted)).

For the reasons set forth above, we find that the government put on substantial proof to show that Tyson was engaged in the business of dealing in firearms. The record further demonstrates that he did so with a sufficiently culpable state of mind. A defendant must act willfully to be criminally liable under § 922(a)(1)(A). *See* 18 U.S.C. § 924(a)(1)(D). A "willful" action is "one undertaken with a 'bad purpose'" or an "evil-meaning mind." *Bryan v. United States*, 524 U.S. 184, 191, 193 (1998). Proof of willfulness therefore requires evidence that "the defendant acted with knowledge that his conduct was unlawful." *Id.* at 192 (interpreting the term "willfully" in 18 U.S.C. § 924(a)(1)(D)) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

Tyson completed an ATF Form 4473 for each firearm he purchased in Tennessee. This form contains language printed in bold directly above the signature line that states, "I . . . understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of the law." Each time he signed a Form 4473, Tyson certified his knowledge of the law. This alone is sufficient to demonstrate willfulness in the circumstances present here. *See United States v. Hayden*, 64 F.3d 126, 129 (3d Cir. 1995). And there was more.

18

Tyson undertook measures to conceal his trafficking activity. He kept coded records. He told others that he was selling "antique" guns, presumably because he knew that "antique" firearms are exempted from the trafficking statute. *See* 18 U.S.C. § 921(a)(1)(3) (defining "firearm" and stating that "antique" firearms are not considered "firearms" for purposes of the trafficking statute). Similarly, Tyson called himself a firearms "collector," which, if true, would also have shielded him from criminal trafficking liability. *See* 18 U.S.C. § 921(a)(21)(C) (stating that one who "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms" is not a "dealer in firearms"). These were lies designed to game the system. After all, none of the firearms purchased by Tyson were antiques and his behavior was decidedly inconsistent with that of a collector.[14] The jury could reasonably conclude that by calling himself a "collector," and by describing his firearms as "antiques," Tyson crafted a falsehood with the statute's exemptions in mind. Such behavior betrays knowledge of unlawful conduct.

In sum, the District Court committed error when it set aside Tyson's conviction on twelve counts of transporting a firearm in the course of dealing firearms without a license. We will vacate the judgment of acquittal with orders to reinstate the jury's verdict on each of the twelve counts.

**B    *Transporting a Firearm in Interstate Commerce with the Intent to Commit a Crime***

---

[14] Nor does Tyson claim that he was a firearms "collector" on appeal.

The jury convicted Tyson of one count of transporting a firearm in interstate commerce with knowledge or reasonable cause to believe that it would be used to commit a crime, a violation of 18 U.S.C. § 924(b). That section provides:

> Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be fined under this title, or imprisoned not more than ten years, or both.

To be convicted under the statute, then, the defendant must (1) transport a firearm in interstate or foreign commerce, and (2) intend to commit a crime with the weapon, have actual knowledge that a crime will be committed with the weapon, or have reasonable cause to believe that a crime will be committed with the weapon. The indictment alleged that Tyson transported eleven firearms to the Virgin Islands on July 31, 2008, with either knowledge or reasonable cause to believe that the weapons would be possessed without a locally issued license. Possession under such circumstances is a crime in the Virgin Islands, punishable by at least one year in prison. 14 V.I.C. § 2253(a).

There is no question that Tyson moved the eleven firearms in interstate commerce. Our focus thus centers exclusively upon § 924(b)'s *mens rea* requirement. Proof of a defendant's subjective knowledge can be difficult to

20

establish, especially when he or she has reason to obfuscate. But Tyson was charged with, and convicted of, knowing or having "reasonable cause to believe" that the weapons would be used to commit the predicate offense.[15] The government contends that even if it did not prove actual knowledge, it at

---

[15] We have yet to address the meaning of "reasonable cause to believe" in the context of § 924(b) or a similar statute. In *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005), we were asked to review the defendant's conviction for selling a stolen firearm in violation of 18 U.S.C. § 922(j). The *mens rea* requirement in that provision, like the one at issue here, imposes liability upon a defendant who receives a firearm that he knows or has reasonable cause to believe is stolen. We recognized that the phrase "reasonable cause to believe" was undefined by statute and that it was the subject of little decisional authority. Indeed, we observed that "[o]nly the Eighth Circuit has discussed the language meaningfully." *McBane*, 433 F.3d at 349 n.9. We then set forth the Eighth Circuit's analysis of the phrase:

> It may be read as requiring proof only that the defendant [sold] a gun that the so-called 'reasonable person' would have believed was stolen in the circumstances of the case. But the better reading, we believe, requires proof that a defendant [sold] a gun that it would have been reasonable for him or her in particular, to believe was stolen.

*Id.* (quoting *United States v. Iron Eyes*, 367 F.3d 781, 785 (8th Cir. 2004)). In *McBane*, we held that there was sufficient evidence to support the jury verdict under either interpretation of "reasonable cause to believe"; thus, we declined to decide which reading of the phrase was correct. In like fashion, we conclude that there was substantial evidence to support Tyson's conviction under either reading of the scienter requirement. We therefore leave a more rigorous statutory analysis for another day.

least established that Tyson had reasonable cause to believe the firearms would be possessed without a firearms license. We agree.

Tyson transported as many as thirty-five firearms to the Virgin Islands over the course of seven months. As we explained above, a reasonable jury could conclude that Tyson sold twenty-three of these weapons and that he intended to do the same with the eleven he imported on July 31. He sold at least one of these weapons at a significant markup, and there was evidence that Tyson profited from his other sales as well. Furthermore, in four trips to the Virgin Islands, Tyson made no attempt to comply with the local licensing scheme; he did not register any of the firearms he had imported prior to July 31, and he never applied for or received a license to carry a firearm on the island. A reasonable jury could have assessed the sum of this evidence—repetitive bootleg sales for above-market prices—and found that Tyson flouted local licensing requirements in order to transact business with individuals who were themselves unlicensed. After all, Tyson's customers presumably paid above-market prices because they were unable to obtain a firearm through legitimate channels. Tyson's repeated sales to individuals who were likely to be unlicensed allowed the jury to reasonably conclude that he acted with a sufficiently culpable state of mind.

The District Court's judgment of acquittal was therefore in error. We will vacate that disposition with instructions to reinstate the jury verdict.

C     *Transferring a Firearm to a Person the Transferor Knows or Has Reasonable Cause to Believe is a Resident of Another State*

The indictment charged Tyson with one count of violating 18 U.S.C. § 922(a)(5),[16] which makes it unlawful

[16] Specifically, Count Twenty-Six of the indictment reads, "On or about the[sic] July 31, 2008, at St. Thomas, in the District of the Virgin Islands, the defendant, Shawn Tyson, not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, did attempt to willfully transfer, transport, and deliver firearms . . . to a person, said person not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that said person was not then residing in the state of Tennessee, the state in which the defendant was residing *at the time of the aforesaid transfer, transportation, and delivery of the firearms*, in violation of 18 U.S.C. § 922(a)(5) and 924(a)(1)(D)." (Emphasis added.) By its terms, § 922(a)(5) does not criminalize the attempt to transfer a firearm to an out-of-state resident. But we do not read this count as one charging attempt. Nor do the parties for that matter. The reason is clear enough. Count Twenty-Six describes (by model and serial number) the eleven firearms that Tyson placed in Morrell's vehicle on July 31, 2008. It cites § 922(a)(5), a provision that criminalizes the actual transfer of firearms. It refers to "the aforesaid transfer, transportation, and delivery of the firearms," rather than the "aforesaid attempted transfer, transportation, and delivery." And an earlier count in the indictment alleges that Tyson transported the same eleven firearms (also identified by model and serial number) to the Virgin Islands and delivered them into Morrell's possession. Thus, Tyson was under no illusion as to the crime with which he was charged: the unlawful transfer of a firearm to an out-of-state resident. *See United States v. Rawlins*, 606 F.3d 73, 78–79 (3d Cir. 2010) (explaining that an indictment is sufficient if it, *inter alia*, contains the elements of the offense and sufficiently apprises the defendant of the crime charged); *see also United States v. Urban*, 404 F.3d

23

for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in . . . the State in which the transferor resides.

Proof that a defendant violated § 922(a)(5) requires substantial evidence of three elements: (1) neither the defendant nor the recipient of the firearm were licensed importers, manufacturers, dealers, or collectors; (2) the defendant willfully transferred the firearm to another person; and (3) the defendant knew or had reasonable cause to believe that the person to whom he transferred the firearm resided in a state other than the defendant's state of residence. *Id.*; 18 U.S.C. § 924(a)(1)(D).

Elements one and three are not in dispute. Nor do the parties challenge the fact that Tyson "transferred" eleven firearms to Morrell on July 31, 2008.[17] The question, again,

---

754, 771 (3d Cir. 2005) ("'We consider an indictment sufficient if, when considered in its entirety, it adequately informs the defendant of the charges against her such that she may prepare a defense and invoke the *double jeopardy clause* when appropriate.'" (quoting *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002))).

[17] To "transfer" a firearm under 18 U.S.C. § 922(a)(5) means to deliver possession of the weapon to another person. The District Court instructed the jury that "possession" may be "constructive, sole and joint." Tyson does not question whether there was sufficient evidence to prove Morrell "possessed" the firearms by virtue of their placement into his vehicle.

is whether Tyson effectuated this transfer with a sufficiently culpable state of mind.  The jury answered this query in the affirmative, but the District Court found the evidence insufficient to support such a result.  The Court reasoned that in order to show Tyson willfully transferred firearms to Morrell, the government was required to establish that he had actual knowledge of § 922(a)(5)'s licensing provision.  Finding insufficient evidence of such proof, the Court set aside the jury's verdict.

The District Court misinterpreted what it means for a defendant to act willfully in this context.  As we explained above, to establish a willful violation of the federal firearms trafficking statute, the government must "prove that the defendant acted with knowledge that the conduct was unlawful."[18]  *Bryan*, 524 U.S. at 192 (quoting *Ratzlaf*, 510 U.S. at 137).  In the context of § 922(a)(5), it was therefore incumbent upon the government to show, not that Tyson knew that he was subject to a particular federal licensing scheme, but that he knew it was unlawful for him to transfer firearms to a resident of the Virgin Islands.  There is sufficient evidence to support such a conclusion.  ATF Form 4473, which Tyson executed each time he purchased a firearm, informed him that the repetitive purchase and resale of firearms for livelihood and profit was a federal crime.  He falsely claimed that his firearms were antiques, called himself a firearms "collector," and coded accounting documents, all in order to evade detection.  Furthermore, Tyson disregarded Virgin Islands registration and licensing requirements so that

---

[18] In *Bryan v. United States*, 524 U.S. 184 (1998), the Supreme Court explicitly rejected the contention that proof of willful misconduct requires evidence that a defendant knew of the licensing requirements in the federal firearms statutes.

he could expeditiously traffic guns on the black market.[19] From this evidence, and in light of the record as a whole, the jury could reasonably infer that Tyson acted with an "evil-meaning mind"; he knew that it was unlawful to transport firearms to St. Thomas and deliver those weapons to Morrell, an out-of-state resident. *See Bryan*, 524 U.S. at 191–93 (explaining that to prove the defendant acted willfully, the government must show that he or she acted with "bad purpose" to disobey or disregard the law).

The District Court's contrary conclusion was in error. Accordingly, we will vacate the judgment of acquittal on this count with instructions to reinstate the jury verdict.

*D      Conspiracy to Unlawfully Transport Firearms*

In addition to the substantive trafficking counts discussed above, Count One of the indictment charged Tyson and Morrell, along with persons known and unknown, with conspiracy to unlawfully transport firearms in violation of 18 U.S.C. § 371. To sustain Tyson's conviction under this count, the evidence must be sufficient to show that (1) the alleged conspirators shared a common goal or purpose, *viz.* to traffic firearms illegally, (2) Tyson knew of that purpose and intended to achieve it, and (3) Tyson reached an agreement with his alleged co-conspirators to achieve the conspiracy's aims. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir.

---

[19] After Tyson's arrest, he told ATF Agent Stricklin that he had intended to register the eleven firearms, but was stopped by the police before he could do so. This statement shows that at the time of his arrest, Tyson knew about the registration requirements. The jury could reasonably infer that he knew about those requirements throughout the duration of his trafficking scheme.

26

2006); *United States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001); *see also Boria*, 592 F.3d at 481 (explaining that the conspiracy's common goal or purpose must be illegal). This Court has characterized the third factor set forth above—an agreement between the defendant and another individual—as "the essence of the [conspiracy] offense." *Pressler*, 256 F.3d at 147. It is, in other words, the sine qua non of the crime itself. *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (stating that "'a conspiracy requires an agreement to commit some other crime beyond the crime constituted by the agreement itself.'" (quoting *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994))).

When a conspiracy conviction is at issue, we must closely scrutinize the sufficiency of the evidence. *United States v. Schramm*, 75 F.3d 156, 159 (3d Cir. 1996) ("'[T]he sufficiency of the evidence in a conspiracy prosecution requires close scrutiny.'" (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987))). The reason is self-evident: a defendant's guilt must always remain "individual and personal." *Boria*, 592 F.3d at 480; *United States v. Samuels*, 741 F.2d 570, 575 (3d Cir. 1984). "'[S]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict.'" *Brodie*, 403 F.3d at 134 (quoting *Coleman*, 811 F.2d at 808). Furthermore, a conspiracy may not be proved merely "'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." *Id.* (quoting *Coleman*, 811 F.2d at 808).

In the instant matter, the District Court held that there was not substantial evidence to prove that Tyson entered into an illicit agreement to traffic firearms with at least one other individual. The government disputes this finding and

27

contends that a reasonable jury could have inferred that Tyson and Morrell entered into an illegal agreement based upon their "unusual and suspicious activity in Tennessee and the Virgin Islands." For his part, Tyson argues that the District Court's disposition should be affirmed. Moreover, he claims that his criminal liability is foreclosed as a matter of law by the jury's acquittal of Morrell—Tyson's only alleged co-conspirator. To support this assertion, Tyson invokes the common law "rule of consistency," which requires the reversal of a conspiracy conviction when all of a defendant's alleged co-conspirators are acquitted of the same conspiracy charge in the same trial. We begin by addressing Tyson's "rule of consistency" argument before evaluating the sufficiency of the evidence adduced by the government in its case-in-chief.

### 1    Applicability of the Rule of Consistency

The doctrine known as the "rule of consistency" requires that where all possible co-conspirators are jointly tried, and all but one are acquitted, the conviction of the remaining co-conspirator must be set aside. *United States v. Twigg*, 588 F.2d 373, 383 n.11 (3d Cir. 1978); *United States v. Gordon*, 242 F.2d 122, 125 (3d Cir. 1956); *see also Gov't of the Virgin Islands v. Hoheb*, 777 F.2d 138, 143 (3d Cir. 1985) (Garth, J., concurring). The idea, as articulated by one of our sister courts of appeals, is "that the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all." *United States v. Espinosa-Cerpa*, 630 F.2d 328, 331 (5th Cir. 1980). Application of the rule is narrow: it does not apply when alleged co-conspirators are tried separately and only one

defendant is convicted. *See Hoheb*, 777 F.2d at 140–41. Nor is it applicable when "it is alleged and proven that the defendant conspired with persons unknown."[20] *Id.* (citing cases).

The rule of consistency was at one time uniformly followed in both federal and state courts. Chad W. Coulter, Comment, *The Unnecessary Rule of Consistency in Conspiracy Trials*, 135 U. Pa. L. Rev. 223, 225 (1986). But the rule's viability was dealt a serious blow in the 1980s, when the Supreme Court issued its unanimous decision in *Powell v. United States*, 469 U.S. 57 (1984). Powell, who was tried alone, was found guilty of using a telephone to facilitate the drug conspiracy for which she was acquitted. The Court held that although this result was inconsistent, it was not for a judge to go behind the jury's decision in such circumstances. True, the verdict may have been the product of juror error or plain irrationality. But an inconsistent verdict may also be the product of juror lenity, which historically has operated "as a check against arbitrary or oppressive exercises of power by the Executive Branch." *Id.* at 65. The point, according to *Powell*, is that a reviewing court cannot know why the jury reached its verdict. Rather than task courts with the responsibility to find out, the *Powell* Court held that inconsistent verdicts are not reviewable merely because they are inconsistent. *Id.* at 66.

---

[20] The indictment in this case charged Tyson and Morrell of conspiring with persons known and unknown. However, the record does not contain substantial evidence to support a charge based on an agreement with unindicted or unknown persons. Furthermore, the government's argument on appeal is based exclusively on Tyson's purported agreement with Morrell.

*Powell* does not directly address inconsistency among jointly tried co-conspirators, but every court of appeals to consider the question has held that *Powell*'s logic fatally undermines the rule of consistency. *See, e.g.*, *United States v. Morton*, 412 F.3d 901, 904 (8th Cir. 2005); *United States v. Nichols*, 374 F.3d 959, 970–71 & n.9 (10th Cir. 2004), *vacated on other grounds*, 543 U.S. 1113 (2005); *United States v. Crayton*, 357 F.3d 560, 566–67 (6th Cir. 2004); *United States v. Zuniga-Salinas*, 952 F.2d 876, 878 & n.3 (5th Cir. 1992) (en banc); *United States v. Bucuvalas*, 909 F.2d 593, 595–96 (1st Cir. 1990); *United States v. Valles-Valencia*, 823 F.2d 381, 382 (9th Cir. 1987). As the Sixth Circuit has explained, under *Powell*, "the acquittal of all but one co-conspirator during the same trial does not necessarily indicate that the jury found no agreement to act." *Crayton*, 357 F.3d at 565. Instead, the verdict may represent a manifestation of lenity, which *Powell* clearly held was not subject to judicial review. *Id.*

We have not had occasion to address the continuing applicability of the rule of consistency in multi-defendant conspiracy trials.[21] We do so now and hold that the rule is no longer viable in cases such as the one at bar. The jury's verdict, even if it is not consistent, may reflect the decision to exercise lenity with respect to one or more defendants. *See Powell*, 469 U.S. at 65. To exercise such discretion is the jury's prerogative, which we will not disturb simply to

---

[21] In a concurring opinion some twenty-five years ago, our colleague, Judge Garth, characterized the rule of consistency as a "vestige of the past," inapplicable in a joint conspiracy trial. *Gov't of the Virgin Islands v. Hoheb*, 777 F.2d 138, 143 (3d Cir. 1985) (Garth, J., concurring). Judge Garth was prescient, and his view is now the view of this Court.

achieve symmetry of results. *See Standefer v. United States*, 477 U.S. 10, 25 (1980). Tyson's invocation of the rule of consistency is thus to no avail. His conviction will stand or fall based upon the sufficiency of the government's evidence.

### 2 Sufficiency of the Evidence

The District Court concluded that the government's evidence was insufficient to show that Tyson and Morrell reached an agreement to unlawfully traffic firearms in violation of federal law. The issue here is not whether Tyson engaged in unilateral trafficking activity; nor is it whether Morrell knew Tyson was so engaged. Rather, the pertinent inquiry is whether Tyson and Morrell agreed to achieve the conspiracy's ends. Conspirators, of course, rarely leave evidence of an explicit understanding or common goal. *United States v. Perez*, 280 F.3d 318, 353 (3d Cir. 2002). Indeed, "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract." *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007). We have therefore recognized that the existence of a conspiratorial agreement may be proven by circumstantial evidence alone. *Brodie*, 403 F.3d at 134 (stating that "the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence"). The District Court correctly recognized this point of law, but nonetheless found that "the government . . . failed to show any integration of activities between Tyson and any other individual that could indirectly prove the existence of a preconceived plan or common understanding to traffic firearms."

The government acknowledges that it advanced no

31

direct evidence that Tyson and Morrell reached an illicit agreement to traffic firearms. It focuses instead on what it calls a pattern of "unusual and suspicious activity in Tennessee and the Virgin Islands." Specifically: Tyson and Morrell flew from the Virgin Islands to Tennessee on February 13, 2008. Morrell stayed with Tyson in his Bristol residence for one week. Tyson purchased fourteen semiautomatic firearms in and around Bristol during the week of Morrell's stay. On February 20, Tyson and Morrell traveled back to the Virgin Islands. Both checked luggage containing firearms. Finally, when Tyson flew back to St. Thomas on July 31, Morrell was waiting at the airport to pick him up. According to the government, this series of "unusual acts," considered in the context of the record as a whole, amount to substantial evidence that Tyson and Morrell entered into the conspiratorial agreement charged in the indictment.

We have previously explained that where several alleged co-conspirators engage in coordinated, "unusual acts," one may reasonably infer the existence of a tacit agreement. For instance, in *United States v. Smith*, 294 F.3d 473 (3d Cir. 2002), five police officers were charged in a criminal conspiracy to violate Earl Faison's civil rights. The officers arrested Faison and beat him to death under the mistaken belief that he had killed one of their colleagues. At trial, the officers argued that while they might have been subject to criminal liability for the underlying offense, there was insufficient proof that they had agreed to engage in coordinated illegality. The evidence, however, indicated that during the course of events, the officers jointly contravened a number of their department's operating procedures governing the apprehension and interrogation of criminal suspects. *Id.*

at 476. For example, the officers arrested Faison and took him to the jail for questioning instead of the county prosecutor's office, where suspects were supposed to be taken; the officers entered the jail through the south entrance when protocol dictated that the north entrance was the designated prisoner drop-off area; Faison was never fingerprinted or photographed, nor was he taken to the booking room; after Faison died from the beating administered by his assailants, several officers submitted consistent but false incident reports. *Id.* We described this collective deviation from standard operating procedure as "unusual" and explained, "The fact that [the officers] . . . engaged as a group in so many unusual acts could certainly lead a reasonable juror to the conclusion that there was at least a tacit agreement between the officers, formed at the scene of the arrest, that Faison was to be assaulted." *Id.* at 478–79.

By characterizing the activities of Tyson and Morrell as "unusual," the government attempts to cast a pall of suspicion over their week-long interaction. But applying labels is insufficient. Unfortunately, the government makes little attempt to explain what is so "unusual" about the conduct at issue. The government does not argue, for instance, that the behavior of Tyson and Morrell deviated from some baseline norm. Nor can they. Almost all of the facts highlighted by the government focus upon lawful conduct. What is more, we know almost nothing about Tyson's interactions with Morrell or Morrell's stay in Tennessee. What little we do know is for the most part mundane: Morrell arrived on the same flight as Tyson, he was present when police came to the residence on February 14,

33

and he departed after staying one week.[22]  On the day of his departure, Morrell traveled to the airport along with Tyson. Both men checked baggage containing firearms.  They then appear to have parted ways until July 31, 2008.

It is difficult to draw any useful inferences from the discrete facts set forth above.  The evidence certainly does not suggest coordinated action in support of a common goal.  To constitute coordinated action, there must be some link between the co-conspirators' conduct that suggests integration or unity of purpose.  *Pressler*, 256 F.3d at 155; *Gibbs*, 190 F.3d at 200–02; *United States v. Powell*, 113 F.3d 464, 467 (3d Cir. 1994).  Co-conspirator A may serve as a lookout for co-conspirator B; two co-conspirators may consult with one another to fix a sale price; co-conspirators may communicate in code.  Here, there is no link between the two men, nor anything to show that one is facilitating the handiwork of the other.  True, Tyson and Morrell arrived at the airport on February 20 together.  But this is not evidence that they were assisting one another.[23]  *See Pressler*, 256 F.3d

---

[22] The evidence does show that Tyson unilaterally—and legally— purchased multiple firearms during the week that Morrell was his houseguest.  There is no evidence, however, that Morrell assisted Tyson in his endeavors.  Several firearms merchants from the Bristol area testified; none identified Morrell or testified to seeing him along with Tyson.

[23] In addition, the government presented no evidence from which to reasonably infer that either Tyson or Morrell knew that what the other was doing was illegal.  Both lawfully checked their respective firearms for flight in Tennessee; to infer that Tyson knew Morrell was not licensed to possess a firearm in the Virgin Islands (or vice versa) is to infer the existence of facts from evidence that simply was not proffered.  *See United States v. Pressler*, 256 F.3d 144, 150 n.2 (3d Cir. 2001) ("We may not

at 153 (finding insufficient evidence of a tacit agreement when alleged co-conspirators merely traveled to Philadelphia together to purchase narcotics). It is, at most, proof of parallel conduct—two individuals attempting to import firearms into the Virgin Islands. A conspiracy prosecution requires more.

Morrell's role in the events of July 31 is perhaps the sole bit of evidence indicative of "coordinated" action. Indeed, this is a significant bit of proof, but not enough. In a sufficiency inquiry, we cannot evaluate evidence in isolation, but must determine "'whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt.'" *Brodie*, 403 F.3d at 134 (quoting *Coleman*, 811 F.2d at 807). Here, Tyson was engaged in trafficking activity for some seven months before he was arrested. Morrell's role in this seven-month narrative spans the length of one week. There is no evidence that Morrell assisted Tyson during any of his first three trips to the Virgin Islands, much less interacted with him. Nor is there evidence that the two communicated with each other when Tyson was stateside. Had the government presented proof of some recurrent pattern of coordinated conduct, then perhaps we might rethink our calculus. But the government has offered no such thing and, in the context of the record as a whole, Morrell's presence at the airport is simply too slim a reed upon which to hang a criminal conspiracy conviction.

The government would no doubt claim that we are overlooking crucial circumstantial evidence that tends to

'infer' the existence of evidence that was simply never proffered.").

support its position on appeal. In particular, Morrell testified that Tyson paid at least $800 of the cost for him to fly from St. Thomas to Tennessee. Morrell also admitted on cross examination that during his stay in Tennessee he (1) accompanied Tyson to at least one gun store, (2) visited a firing range with Tyson, and (3) posed for photographs at Tyson's residence, guns in hand. But because all of this testimony was admitted after the close of the government's evidence, we cannot consider it. Fed. R. Crim. P. 29(b); *Brodie*, 403 F.3d at 134. Under Rule 29, the government may not rely upon testimony admitted through Morrell's cross examination. Rather, the prosecution must rise or fall solely on the basis of the government's proof. Tyson is, in other words, entitled to a verdict based only upon a snapshot of the evidence as it existed when the government concluded its case-in-chief. *Moore*, 504 F.3d at 1347.

In sum, the jury lacked sufficient evidence to find that Tyson and Morrell entered into a tacit agreement to traffic firearms in violation of federal law. We have no doubt that Tyson was engaged in unlawful trafficking activity and, viewing the evidence in the light most favorable to the government, it is reasonable to infer that Morrell knew about some of Tyson's illicit conduct. But our conspiracy jurisprudence does not sanction guilt by association. *United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir. 1989) (stating that "the company an individual chooses to keep" is not evidence of a conspiracy). We will therefore affirm the ruling of the District Court granting judgment of acquittal on the conspiracy count.

*E*     *Unauthorized Possession of a Firearm Under the Virgin Islands Code*

36

The Virgin Islands Code makes it unlawful for any person to have, possess, transport, or carry a firearm without a locally-issued license to do so. 23 V.I.C. § 454; 14 V.I.C. § 2253(a). Tyson was charged with eleven counts of violating this provision—one count for each of the firearms he transported onto the island on July 31, 2008. The jury convicted Tyson on ten of these counts, and the District Court denied Tyson's motion for judgment of acquittal. Tyson appeals the District Court's order, though he acknowledges that the government proved he was in possession of the eleven firearms without a license. Tyson argues, however, that he had an affirmative defense under two separate licensing provisions of the Virgin Islands Code: 23 V.I.C. § 460 and 23 V.I.C. § 470(b). Section 460 requires authorities in the Virgin Islands to recognize a firearms license validly issued by another state or territory. Section 470(b) states that if an individual imports firearms into the Virgin Islands without a license to do so, he or she may avoid criminal liability by "immediately" registering the imported weapons. Tyson argues that either provision furnishes a defense for unauthorized firearm possession.

Tyson did not request a jury instruction for either so-called affirmative defense and the District Court did not provide one. Tyson also did not object to the Court's instructions after they were given. Where a party fails to object to the district court's jury instructions, "he waives the issue on appeal, 'unless the error was so fundamental and highly prejudicial as to constitute plain error.'" *United States v. Zehrbach*, 47 F.3d 1252, 1261 n.6 (3d Cir. 1995) (en banc) (quoting *Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir. 1987)); *see also* Fed. R. Crim. P. 30(d) (stating that failure to object to the court's jury instructions "precludes appellate review,

except as permitted under Rule 52(b)"). To find plain error, we must conclude that (1) there was error; (2) the error was clear or obvious; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the legal proceeding. *United States v. Lee*, 612 F.3d 170, 178 (3d Cir. 2010). If the defendant satisfies this showing, we may, but are not required to, order correction. *United States v. Olano*, 507 U.S. 725, 735–36 (1993) (explaining that the discretion conferred by plain error review "should be employed in those circumstances in which a miscarriage of justice would otherwise result" (internal quotation omitted)).

### 1 23 V.I.C. § 460: Reciprocal Recognition of Out-of-State Licenses

Section 460 states, in pertinent part, that the Virgin Islands shall recognize a firearms license validly issued by another state or territory and "shall allow the [licensee] to exercise all of the privileges in connection therewith." 23 V.I.C. § 460. Courts have characterized this provision as a "statutory exception to the firearm license requirement" and acknowledged, albeit implicitly, that it provides an affirmative defense to a charge for unauthorized possession of a firearm. *See United States v. McKie*, 112 F.3d 626, 631 (3d Cir. 1997); *Toussaint v. Gov't of the Virgin Islands*, 301 F. Supp. 2d 420, 423–24 (D.V.I. 2004) (holding that § 460 is an affirmative defense to § 2253(a)).

To be entitled to an instruction on an affirmative defense, the defendant must present sufficient evidence from which a jury could find in his or her favor on the defense. *See United States v. Bay*, 852 F.2d 702, 704 (3d Cir. 1988). Tyson proffered no evidence to suggest that he was licensed

to possess or deal in firearms anywhere in the United States. Under such circumstances, it would have served no purpose to instruct the jury on a § 460 defense, untethered as it would have been to the evidence of record. Accordingly, we detect no plain error and Tyson's argument is without merit.

### 2 23 V.I.C. § 470(b): Report of Firearms Purchased Outside or Brought into the Virgin Islands

Pursuant to 23 V.I.C. § 470(b),

> Any person upon entering the Virgin Islands bringing with him any firearm or ammunition shall report in writing or in person to the Commissioner immediately of his arrival, furnishing a complete description of the firearm or ammunition brought into the Virgin Islands. He shall also furnish his own name, date of birth and occupation.

We have held that this provision sets forth an affirmative defense to an unauthorized possession of a firearm charge. *McKie*, 112 F.3d at 631. We have not, however, meaningfully discussed the contours of such a defense. Nor need we do so here. Simply put, Tyson did not request an instruction on a § 470(b) defense. Perhaps this was oversight. Perhaps it was strategy. After all, although the evidence arguably would have supported a § 470(b) instruction, Tyson may have reasoned that to present the defense would only serve to highlight his clear guilt under the prima facie elements of § 2253(a). A defendant's strategy is his own. It is not for the district court to *sua sponte* determine which

defenses are appropriate under the circumstances. In short, if Tyson wished to mount a defense under § 470(b), it was incumbent upon him to take the initiative to do so.

The order of the District Court denying Tyson's motion for judgment of acquittal on the basis of § 470(b) will therefore be affirmed.[24]

## IV

For the foregoing reasons, we will reverse in part and affirm in part the final order of the District Court. We will reverse the order on the following charges: (1) twelve counts of transporting a firearm in the course of dealing firearms without a license (Counts Two through Thirteen); (2) one count of transporting a firearm with knowledge or reasonable cause to believe that it would be used to commit a crime (Count Twenty-Five); and (3) one count of transferring a

---

[24] Chief Judge McKee does not believe that the record here would support the affirmative defenses set forth in 23 V.I.C. §§ 460 and 470(b) because Tyson made several trips to the Virgin Islands and not once registered the firearms he was transporting. However, Chief Judge McKee does not agree that those defenses can be deemed waived because of the unique procedural posture of this appeal. As noted, Tyson moved for a judgment of acquittal at the close of the government's case-in-chief, and the District Court reserved its ruling on that motion. Accordingly, Chief Judge McKee notes that we must review the Court's ultimate denial of the motion as the record stood at the close of the government's case, and it would have been premature to request any jury instructions then because the defense had not yet rested. *See* Fed. R. Crim. P. 29(b). Since the affirmative defenses are not supported by the record, however, Chief Judge McKee agrees that Tyson's attempt to rely on those defenses now is meritless.

40

firearm to an out-of-state resident (Count Twenty-Six).  We will affirm the order of the District Court granting Rule 29 relief on the charge of conspiracy to unlawfully transport firearms (Count One).  Finally, we will affirm Tyson's conviction on ten counts of unauthorized possession of a firearm under the Virgin Islands Code.  This matter is remanded for further proceedings.