NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2753
_____

UNITED STATES OF AMERICA

v.

SHAWN DAVIS,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 1-10-00059-001)
Honorable John E. Jones, III, District Judge
_____

Submitted under Third Circuit LAR 34.1(a)
December 16, 2011

BEFORE: SLOVITER, VANASKIE, and GREENBERG, Circuit Judges

(Filed: January 18, 2012)
_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

This matter comes on before this Court on an appeal from a judgment of

conviction and sentence that the District Court entered against the appellant Shawn Davis

on June 21, 2011, following his conviction at a jury trial of conspiracy to possess a

firearm by a previously convicted felon and/or conspiracy to possess a stolen firearm, in violation of 18 U.S.C. § 371. After the jury returned its verdict, Davis moved for a judgment of acquittal but the District Court denied his motion. On this appeal Davis challenges his conviction, asserting that the evidence at the trial was insufficient to allow the jury to convict him. For the reasons we set forth below, we agree with Davis and will reverse his conviction and remand the case to the District Court to enter a judgment of acquittal.

The evidence at the trial viewed in the light most favorably to the government as the verdict winner, see United States v. Hoffecker, 530 F.3d 137, 146 (3d Cir. 2008), revealed the following events. On June 14, 2009, at approximately 2:00 a.m., Pennsylvania State Police Corporal Sean Taylor and Trooper Rodney Fink, in the course of conducting a roving driver under the influence traffic check, stopped an automobile that Davis was driving and owned that was traveling west on Walnut Bottom Road just before Route 465 near Carlisle, Pennsylvania. The troopers stopped the automobile because it crossed the line dividing the lanes of traffic. Delontay Barnes was seated in the front passenger seat and Eric Seigler was seated in the rear passenger-side seat. When Corporal Taylor approached the vehicle, he noticed that Davis had a switchblade knife on his lap. Corporal Taylor then directed Davis to exit the vehicle and, after Davis did so, Taylor placed Davis in handcuffs, and directed him to stand at the rear of the vehicle.

As Corporal Taylor removed Barnes and Seigler from the car, he saw a 9mm pistol protruding from a yellow, semi-translucent plastic shopping bag on the seat or

2

console between Davis and Barnes. He also saw a .38 special revolver on the floor of the rear passenger side where Seigler had been seated. Corporal Taylor secured the weapons, read the three men their Miranda rights, and placed them under arrest. At that time all three occupants of the vehicle admitted to having been convicted of felonies but they all denied that they owned the firearms and denied knowing that the guns were in the vehicle.

Subsequently, Corporal Taylor asked the men where they were going, and Seigler responded that they were driving to Plainfield, Pennsylvania to see a girl. Corporal Taylor responded that the men were driving in the opposite direction from Plainfield[1] and asked for the girl's name and number to verify Seigler's claim. In response, Seigler stated that he had nothing further to say.

The Commonwealth of Pennsylvania filed the initial criminal complaint arising from this incident, charging Davis with offenses under the Pennsylvania Crimes Code and the Pennsylvania Motor Vehicle Code. On March 4, 2010, however, a grand jury in the Middle District of Pennsylvania returned a multi-count indictment against Davis, Barnes, and Seigler that superseded the state charges. In relevant part, Count I charged the three defendants with conspiracy to possess a firearm by a previously-convicted felon and/or to possess a stolen firearm in violation of 18 U.S.C. §§ 371, 922(g)(1), and 922(j),

_____

[1]The parties dispute whether the direction in which Davis and his companions were traveling was actually away from Plainfield or, as Davis asserts, was an indirect route to the same place. We note that the men were heading essentially in a southwesterly direction on Walnut Bottom Road and Plainfield was north of their location when the Troopers stopped them.

Count II charged the three defendants with possession of a firearm by a previously-convicted felon in violation of 18 U.S.C. § 922(g)(1), and Count V charged the defendants with possession of a stolen firearm in violation of 18 U.S.C. § 922(g)(1).[2] Davis entered a plea of not guilty but Barnes and Seigler pled guilty to Count II, possession of a firearm by a previously-convicted felon.

On June 4, 2010, Davis filed a motion to suppress evidence seeking to exclude all evidence seized from the vehicle, predicating the motion on an assertion that the evidence had been seized in an illegal search. The District Court, however, denied the motion and Davis does not challenge that disposition on this appeal. Thereafter, Davis on January 6, 2011, filed a motion in limine to prohibit the introduction of certain evidence seized from the vehicle as unfairly prejudicial and irrelevant. That evidence consisted of a night vision scope, three pairs of black gloves, four handkerchiefs, a gray wool knit cap, a digital camera, binoculars, three dark hooded sweatshirts, a flashlight, and two two-way radio devices. The Court granted the motion and excluded the listed evidence from trial.

At the trial, the government and Davis stipulated that Davis, Barnes, and Seigler were all previously-convicted felons and that these convictions prohibited them from possessing any firearms or ammunition. They stipulated as well that the guns retrieved from Davis's vehicle were firearms as defined in 18 U.S.C. § 921(a)(3), that the firearms had been shipped or transported in interstate or foreign commerce as defined in 18 U.S.C.

---

[2]The parties' briefs do not specify what other offenses the indictment charged or how those charges were resolved and the parties have not included the indictment in the appendix. We have not found it necessary to ascertain the disposition of those charges to adjudicate this appeal.

4

§ 922(g), and that both firearms had been stolen as that act is defined in 18 U.S.C. § 922(j). At trial, Corporal Taylor and Trooper Fink both testified, and they provided the factual account of the incident that we recited above.

After the troopers testified, Davis's girlfriend, Alyssa Statler, and Barnes and Seigler, all of whom Davis called as witnesses, testified. Statler recounted that she had discovered that she was pregnant on June 13, 2009, and that she and Davis made plans for Davis to visit her house that night after he got off from work around 1:30 in the morning. Statler stated that Davis called her from work and told her that he was going to give his friends a ride after he left work but that he would go to her house afterwards.

Seigler testified that he asked Davis to give him a ride to a friend's house in Newville, Pennsylvania[3] after Davis got off work. Seigler testified that the purpose of the ride was to take him to his friend's house so that he could drop off his .38 revolver there but he did not testify that Davis knew that he had that objective. He stated that he was carrying the revolver in the waistband of his pants when he entered Davis's vehicle and that the gun was not visible to Davis because his shirt covered it. Seigler testified that once he realized the vehicle was being pulled over, he put the .38 revolver on the

---

[3]Corporal Taylor testified that Seigler said that his friend's house was in Plainfield but Seigler testified at trial that he told Corporal Taylor that his friend's house was in Newville. We note that Newville and Plainfield are adjacent towns, with Newville situated approximately 6.3 miles southwest of Plainfield. Although the government in its brief makes it clear that it thinks otherwise, this minor discrepancy does not seem to us to be particularly significant. In any event, the discrepancy does not somehow overcome the insufficiency of the government's proof.

floor of the car. Seigler also testified that he did not tell Davis he was carrying a gun and that there was no conversation in the vehicle regarding his gun.

Barnes testified that Davis agreed to pick up Seigler and him and go to a girl's house. Barnes also testified that when he entered Davis's vehicle he, Barnes, was carrying the 9mm pistol in the waistband of his pants, probably with his shirt pulled over it, and that he placed it in the yellow bag once he saw the emergency lights activated on the troopers' car behind them. Barnes testified that he did not tell Davis that he had a gun in his possession, did not show Davis his gun, there was no conversation in the vehicle regarding his gun, and, to the best of Barnes's knowledge, Davis did not know Barnes had brought a gun into his car.

At the close of the government's case, Davis made an unsuccessful oral motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), and at the conclusion of his case, Davis unsuccessfully renewed that motion. On January 11, 2011, the jury returned a verdict convicting Davis on Count I, conspiracy to possess a firearm by a previously-convicted felon and/or to possess a stolen firearm, but it acquitted Davis on Counts II and V.[4] After the District Court dismissed the jury, Davis made an oral motion for a judgment of acquittal on Count I pursuant to Rule 29(b). The parties submitted briefs on that motion, and on April 6, 2011, the Court denied the motion, and

_____

[4]The District Court gave the jury a verdict slip charging conspiracy to possess a firearm by a previously-convicted felon and/or to possess a stolen firearm. In these circumstances, we will uphold the jury's verdict so long as there is sufficient evidence to support either one of these charges. See Griffin v. United States, 502 U.S. 46, 49, 112 S.Ct. 466, 469 (1991).

sentenced Davis to a 55-month custodial term to be followed by a three-year term of supervised release. Davis then appealed.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction to review the conviction under 28 U.S.C. § 1291. We make a de novo review of the order denying the Rule 29 motion for a judgment of acquittal. See United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006); United States v. Smith, 294 F.3d 473, 476-77 (3d Cir. 2002). In considering such a motion, we "'review the record in the light more favorable to the prosecution to determine whether any rational trier of fact could have found proof beyond a reasonable doubt based on the available evidence.'" Bobb, 471 F.3d at 494. "[W]e must sustain the verdict 'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'" United States v. McKee, 506 F.3d 225, 232 (3d Cir. 2007) (quoting United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995)). We draw all reasonable inferences in favor of the jury's verdict and will find that the evidence was insufficient only where the prosecution's failure of proof is clear. Smith, 294 F.3d at 476-77. In making our review, we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

"[T]o sustain a conviction under [18 U.S.C.] § 371, the government must show: (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." United States v. Rigas, 605 F.3d 194, 206 (3d

7

Cir. 2010) (en banc) (internal quotation marks and citation omitted); see also Bobb, 471 F.3d at 494 ("The essential elements of conspiracy are (1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.") (internal quotation marks and citation omitted). "The government must proffer evidence that [the defendant] knew of the agreement and intended both to join it and accomplish its illegal objects." McKee, 506 F.3d at 241. "The government must establish each element beyond a reasonable doubt." United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010); see also United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004) ("The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt.") (internal quotation marks and citation omitted); United States v. Idowu, 157 F.3d 265, 268 (3d Cir. 1998) (same).

A conspiratorial agreement may be explicit or implicit. McKee, 506 F.3d at 238. Thus, the government need not present direct evidence of the agreement. Therefore, the existence of "a conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme." Id. Indeed, "[t]he prosecution may bear [its] burden entirely through circumstantial evidence." Bobb, 471 F.3d at 494; see also Brodie, 402 F.3d at 134 (same).

Nevertheless, "[w]hen a conspiracy conviction is at issue, we must closely scrutinize the sufficiency of the evidence." United States v. Tyson, 653 F.3d 192, 206 (3d Cir. 2011) (citing United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996)

8

("'[T]he sufficiency of the evidence in a conspiracy prosecution requires close scrutiny.'" (quoting United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987)))). This close scrutiny is necessary because although a conspiracy charge requires consideration of whether there is evidence of an alleged agreement between two or more persons, "a defendant's guilt must always remain 'individual and personal.'" Tyson, 653 F.3d at 206 (quoting Boria, 592 F.3d at 480).

The government acknowledges that, as is not unusual in conspiracy prosecutions, it did not offer direct evidence that there was a conspiracy among the alleged conspirators to commit the offense or offenses that were the object of the alleged conspiracy, here the unlawful possession of one or both of the firearms the troopers seized from Davis's vehicle. Instead, the government contends that what it regards as unusual circumstances surrounding the night of Davis's arrest sufficiently support Davis's conviction because they typically would not arise by coincidence. The facts to which the government points are that Davis agreed to provide Barnes and Seigler with a car ride despite Davis's girlfriend's recent discovery that she was pregnant, the men were in a vehicle together on a rural road at 2:00 in the morning, Davis had a switchblade knife on his lap, and the three men were in close proximity to the firearms when the troopers stopped them. Moreover, all three men denied ownership of the handguns and Seigler provided what the government believes was an implausible explanation regarding the men's destination.[5]

---

[5]The government also contends that the jury was entitled to disregard any potentially exculpatory testimony from Barnes and Seigler regarding Davis's lack of knowledge of their possession of handguns. We agree that the jury was entitled to determine Barnes's and Seigler's credibility and assign the quantum of weight to their testimony that it

9

The District Court agreed with the government and concluded that "the totality of the circumstantial evidence . . . suggesting an agreement to actually or constructively possess and deliver a firearm at 2:00 a.m., when [Davis] had ostensibly more important engagements to attend, is more than adequate for a rational jury to conclude that 'at least a tacit agreement' existed [among Davis, Barnes, and Seigler] based on the variety of unusual acts performed by members of the conspiracy."  App. at 24.

By characterizing the circumstances of June 14 as "unusual," the government essentially attempts to align this case with United States v. Smith, 294 F.3d 473.  In Smith, five local police officers were charged with forming a criminal conspiracy to violate Earl Faison's civil rights when the officers arrested him and then beat him to death under the belief that he was responsible for another officer's death.[6]  A jury convicted the officers but the district court granted their motion for an acquittal.  On the government's appeal we reversed as we concluded that testimony that the officers together deviated from their department's standard operating procedure governing apprehension and interrogation of criminal suspects was sufficient to support the jury's verdict.  That testimony showed that it was unusual for ten officers to accompany a suspect to the station as they did following Faison's arrest, the officers contravened a

---

deemed appropriate.  Thus, we do not disturb the jury's verdict on the basis that we accept Barnes's and Seigler's testimony as true and, indeed, we neither accept nor reject their testimony.  The lack of any testimony supporting the government's case, however, is a relevant consideration.

[6] That belief was mistaken but even if it had been correct the evidence in that case would have supported the convictions.  The police are no more justified in beating a guilty prisoner to death than an innocent prisoner.

10

directive to take suspects to the County Prosecutor's Office and instead took Faison to the jail, the officers brought Faison into the jail through a different entrance than the entrance designated for the drop off of prisoners, and, contrary to routine practice, Faison was never taken to the booking room, fingerprinted, photographed, or given the opportunity to wash his face to remove the pepper spray the officers had used on him. Id. at 476, 478. Furthermore, there was evidence that certain of the officers submitted consistent but false reports regarding the circumstances of Faison's arrest. Id. at 478. We explained that "[t]he fact that a group of people, arguably with a common goal — that of punishing [the fallen officer's] murderer — engaged as a group in so many unusual acts could certainly lead a reasonable juror to the conclusion that there was at least a tacit agreement between the officers . . . ." Id.

Recently, in United States v. Tyson, 653 F.3d 192, a case we find instructive here, we reviewed the boundaries of Smith. In Tyson, Shawn Tyson transported firearms illegally between Tennessee and the Virgin Islands and was charged with conspiracy to transport firearms, among other crimes. The government argued that the "unusual" activities of Tyson and his alleged co-conspirator, Kelroy Morrell, provided sufficient evidence to support the conspiracy conviction. Id. at 208-09. In this regard, the government pointed to the facts that Tyson and Morrell flew together from the Virgin Islands to Tennessee, and that Morrell stayed with Tyson in Tyson's Tennessee residence for one week, during which time Tyson purchased 14 firearms. Id. During a police search that week in Tennessee officers found Tyson and Morrell sitting in Tyson's home with a pistol in plain view of the men and more guns in plain view in a bedroom. Id. at

11

196. Later, Tyson and Morrell traveled back to the Virgin Islands together, and both checked luggage containing firearms. Id. Neither man registered the firearms when they arrived in the Virgin Islands as required by law. When Tyson made another trip to the Virgin Islands, Morrell picked him up at the airport and they placed Tyson's luggage containing numerous firearms and ammunition in the trunk of Morrell's vehicle. Id. at 197.

We found the evidence insufficient to convict Tyson of conspiracy to transport firearms and thus upheld the district court's order granting Tyson an acquittal on this count of the indictment after his conviction at a jury trial. We stated that "[b]y characterizing the activities of Tyson and Morrell as 'unusual,' the government attempts to cast a pall of suspicion over their week-long interaction[,] [b]ut applying labels is insufficient . . . [and] [u]nfortunately, the government makes little attempt to explain what is so 'unusual' about the conduct at issue." Id. at 209. In this regard, we noted that the government could not identify "some baseline norm" from which the defendants deviated and "[a]lmost all of the facts highlighted by the government focus upon lawful conduct." Id. We found further that the government failed to demonstrate that Tyson and Morrell engaged in "coordinated action in support of a common goal" because "[t]o constitute coordinated action, there must be some link between the co-conspirators' conduct that suggests integration or unity of purpose." Id. at 210 (citations omitted). We concluded that the facts at most demonstrated "proof of parallel conduct" but did not

evince "a link between the two men" nor did it show "that one is facilitating the handiwork of the other." Id.[7]

In Smith, there was ample evidence that the police officers shared a common goal and together deviated from established procedure numerous times in the course of Faison's arrest and treatment. In our case, however, as in Tyson, the government attempts to ascribe the same moniker of unusualness to a set of far less extraordinary facts. The government's attempt to label as suspicious the timing of the 2:00 a.m. drive and the fact that Davis, Barnes, and Seigler were traveling on a rural road is unconvincing, particularly in light of the fact that there was evidence that Davis's work shift ended at 1:30 a.m. Further, Davis's agreement to provide Barnes and Seigler with rides notwithstanding his girlfriend's revelation that she was pregnant, though arguably insensitive,[8] does not come close to the level of unusual joint conduct that we found supported the conspiracy conviction in Smith. We acknowledge that the circumstances that Davis had a switchblade on his person and that the three men were "in close proximity to loaded handguns" when the troopers stopped them is certainly suspicious. Nevertheless, these facts — while unusual — are not sufficient to show that Davis,

---

[7] There were numerous additional charges in Tyson but we need not discuss their disposition.

[8] Judges must be careful not to assume that their own social values are the norm and then render decisions merely because people who have different values have somehow deviated from what the judges regard as an appropriate standard of conduct. Exercising that restraint, we will not say that even though we cannot be certain as to why Barnes and Seigler were in Davis's car or where the three men were going when the troopers stopped them, Davis's conduct in taking his friends somewhere before he visited his pregnant girlfriend was somehow inappropriate.

Barnes, and Seigler or Davis and one of the two other men, engaged in coordinated action in support of the allegedly common goal of possessing the firearms.

In an attempt to bolster its case, the government puts forth two specific theories upon which it bases its contention that the jury could have found the existence of a conspiratorial agreement. First, the government contends that the timing and location of the stop of the vehicle and the fact that each occupant was in close proximity to one of the firearms or a knife gives rise to a reasonable inference that the occupants intended to engage in some type of illegal activity that involved possessing the guns. Second, the government contends that if the jury believed Seigler's testimony that Davis was giving Barnes and Seigler a ride so that Seigler could drop off his gun at his friend's house, it could have inferred that Davis knew of the purpose of the ride. Based on that inference, the government contends that the jury could have drawn the further inference that Davis conspired with Seigler to possess the gun by knowingly giving him a ride to the girl's house to drop it off.

The government's first theory goes well beyond the evidence actually presented in this case and depends on unbridled speculation. See Boria, 592 F.3d at 481 ("[O]ur conspiracy case law forbids the upholding of a conviction on the basis of . . . speculation.") (quoting United States v. Thomas, 114 F.3d 403, 406 (3d Cir. 1997)). A conspiracy may be proven by circumstantial evidence and reasonable inferences drawn from such proof, but those inferences "must have a logical and convincing connection to the facts established." Boria, 592 F.3d at 481 (emphasis added); see also United States v. Applewhaite, 195 F.3d 679, 684 (3d Cir. 1999) ("The law . . . requires that the inferences

14

drawn . . . have a logical and <u>convincing connection</u> to the facts established.") (emphasis added) (internal quotation marks omitted). Though it is entirely possible that the men intended to engage in illegal activity when the troopers stopped them, it would require undue speculation to infer from the handful of facts established at trial that they had that intent. However, even if such an inference could be drawn, there simply would be no plausible connection between that inference and the further inference that the men also conspired to possess one or both of the firearms.[9]

The government's second theory has a stronger foundation but still is inadequate to support the conviction. Seigler testified that the purpose of the ride was to drop off his gun at his friend's house, and the jury certainly reasonably could have inferred from that statement that Davis knew of Seigler's objective. Nevertheless, the evidence is inadequate to support the additional inference needed to uphold the verdict that Davis conspired either explicitly or tacitly with Seigler to possess jointly Seigler's gun for the duration of the car ride. As in <u>Tyson</u>, there is no evidence that Davis facilitated Seigler's possession of the gun or any other proof showing a unity of purpose or a common goal between the two men with respect to possession of the firearm. The fact that Davis provided a car ride to Seigler obviously demonstrates a level of coordinated action but that mere transportation is not enough proof from which to infer Davis conspired with Seigler to possess his gun. We reject any contention that a showing that a person is

_____

[9]We note that a reasonable argument can be made that Davis's possession of his own weapon undermines the inference that he conspired to possess the remaining two weapons. We, however, do not predicate our result on this observation.

15

driving someone who the driver knows is carrying a gun in itself establishes that there was a conspiracy between the driver and the passenger to possess the gun. See United States v. Mercado, 610 F.3d 841, 847 n.7 (3d Cir. 2010) ("To support a conspiracy conviction, the Government must establish, among other elements, that the alleged conspirator entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.") (internal quotation marks and citation omitted); cf. Tyson, 653 F.3d at 210 (noting that although Morrell's decision to provide Tyson a ride from the airport evinced some coordinated action it was "too slim a reed upon which to hang a criminal conspiracy conviction").[10] In fact, we note that any contention that Davis agreed to provide Seigler a ride to drop off Seigler's gun and that the men thereby agreed that they would together possess the gun on the way to the friend's house is not even logical.

As we explained in Tyson, the existence of an agreement is "'the essence of the [conspiracy] offense.'" 653 F.3d at 206 (quoting United States v. Pressler, 256 F.3d 144, 147 (3d Cir. 2001)). "It is, in other words, the sine qua non of the crime itself." Tyson, 653 F.3d at 206. In this case, a finding beyond a reasonable doubt that there was even a tacit conspiracy to possess the firearms could be predicated only on a foundation based on the piling of inference upon inference derived from facts that in the aggregate do not support those inferences. We cannot approve such a process. See United States v.

---

[10] Though we reject the government's contention that if Davis knowingly provided a ride to Seigler to allow Seigler to drop off his gun that that act in itself demonstrates that Davis entered into a conspiracy to possess the firearm, we recognize that the act is certainly relevant to the conspiracy charge.

16

<u>Coleman</u>, 811 F.2d 804, 808 (3d Cir. 1987) ("In a [conspiracy] case, the record must be scrutinized with great care for such evidence of conspiracy, since conspiracy cannot be proven '. . . by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes.'" (quoting <u>Anderson v. United States</u>, 417 U.S. 211, 224, 94 S.Ct. 2253, 2262 (1974) (internal quotation marks omitted))).

In conclusion we reiterate that the deferential standard of review that we exercise in this case should make us reluctant to disturb the District Court's order upholding the jury's verdict, and, indeed, it does exactly that. Nevertheless, the degree of deference of our review is tempered by the fact that we must find that there was sufficient evidence to allow a rational trier of fact to conclude that Davis was guilty of the crime of which the jury convicted him beyond a reasonable doubt. We conclude that the jury lacked sufficient evidence to find beyond a reasonable doubt that Davis entered into a conspiracy to possess a stolen firearm or to possess a firearm by a previously-convicted felon or, indeed, simply to possess any firearm. We therefore will reverse the order of the District Court denying Davis's motion for a judgment of acquittal and will reverse the judgment of conviction and sentence of June 21, 2011. We will remand the case to the District Court to enter a judgment of acquittal.